UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

|  |  |  |
|---|---|---|
| KURT ROBERT SMITH, | ) | |
| | ) | |
| Petitioner, | ) | No. 5:15-CV-252-DCR-HAI |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | |
| JOSEPH MEKO, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On August 26, 2015, state prisoner Kurt Robert Smith, through counsel, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  D.E. 1.  The Warden responded (D.E. 8), and Smith filed a reply (D.E. 11).  For the reasons explained below, the undersigned recommends that Smith's petition be **DISMISSED** as time-barred.  Alternatively, if not time-barred, it should be **DENIED** on the merits.

## I.  Factual and Procedural Background

In 2001, Smith was convicted of murder and sentenced to life in prison.  *See Smith v. Commonwealth*, No. 2002-SC-0293-MR, 2003 WL 22415620, at \*1 (Ky. Oct. 23, 2003).[1]  He expected to become parole-eligible in March 2021.  *See* D.E. 1 at 2.  On August 21, 2009, a riot occurred at Northpoint Training Center ("NTC"), where Smith was detained.  During the riot, someone threw an object that struck Officer Jesus Cabrera.

---

[1] Smith's murder conviction is the subject of a separate habeas petition currently on appeal before the Sixth Circuit. *Smith v. Crews*, No. 14-5994, appeal from *Smith v. Taylor*, No. 5:10-CV-91-KKC-HAI, 2014 WL 3513180, at \*1 (E.D. Ky. July 16, 2014).

1

On March 22, 2010, a Kentucky grand jury indicted Smith on two charges stemming from the riot. *See* D.E. 8-3 at 1. The first charge alleged that Smith committed third-degree assault against Officer Cabrera "by striking him with an object[] and causing physical injury" in violation of KRS § 508.025(b). *Id.* The second charge alleged that Smith committed first-degree riot in violation of KRS § 525.020 by knowingly participating in a riot at NTC and "as a result of said riot substantial property damage occurred to Northpoint Training Center."[2] *Id.* Both charges were Class D felonies. *Id.* In Kentucky, a Class D felony carries a prison term between one and five years. Ky. Rev. Stat. § 532.020(1)(a).

On July 8, 2010, the Commonwealth offered Smith a plea agreement, which he accepted pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970) (permitting a defendant to plead guilty while maintaining his factual innocence). D.E. 8-3 at 2-5. The recommended sentence under the agreement was five years of imprisonment on each charge, but the sentences were "to run concurrently with each other and concurrently with the life sentence" he was already serving. *Id.* at 2. Accordingly, the trial court's judgment specified that Smith would receive five years on each charge, "[t]o run concurrently with each other and concurrently with [the] life sentence." *Id.* at 7. That judgment was entered August 13, 2010. *Id.* at 6.

Over two years later, Smith filed a *pro se* motion to vacate his judgment and sentence under Kentucky Rule of Criminal Procedure 11.42 ("R.Cr. 11.42"). D.E. 8-3 at 10-14. Smith mailed the motion on October 23, 2012, and the Boyle Circuit Court filed it on October 30. *Id.*

---

[2] Under KRS § 525.020, "A person is guilty of riot in the first degree when: (a) he knowingly participates in a riot; and (b) In the course of and as a result of such riot a person other than one (1) of the participants suffers physical injury or substantial property damage occurs." The indictment charges Smith under the "substantial property damage" provision, not the physical injury provision. D.E. 8-3 at 1. Nowhere in his briefs to this Court does Smith argue that he did not knowingly participate in a riot or that substantial property damage did not occur. The Court also notes a typographical error in the indictment—it charges Smith under the non-existent KRS § 525.202 instead of § 525.020.

Among other claims, Smith alleged that his attorney had "provided grossly ineffective assistance of counsel" in violation of *Strickland v. Washington*, 466 U.S. 668 (1984).  *Id.* at 10.

Smith's first *Strickland* claim in his state motion alleged that his lawyer misadvised him regarding the effect of his guilty pleas on his parole eligibility date.  According to Smith, his attorney told him that obtaining concurrent sentences through the plea agreement would leave his parole eligibility date (stemming from his murder conviction) unchanged.  *Id.* at 10-12.

The trial court did indeed order that Smith's 2010 sentences run concurrently with each other and concurrent to his previous life sentence.  D.E. 8-3 at 7.  However, a Kentucky administrative regulation mandates that when a prisoner is convicted of a new crime while incarcerated, parole eligibility on the new conviction does not begin to accrue until the prisoner becomes parole-eligible on the original conviction.  The relevant regulation states:

(4) Parole review for crimes committed while in an institution or while on escape. If an inmate commits a crime while confined in an institution or while on an escape and receives a concurrent or consecutive sentence for this crime, eligibility time towards parole consideration on the latter sentence shall not begin to accrue until he becomes eligible for parole on his original sentence.  This shall include a life sentence.

(a) Except as provided by paragraph (b) of this subsection, in determining parole eligibility for an inmate who receives a sentence for . . . a crime committed while in the institution . . ., the total parole eligibility shall be set by adding the following, regardless of whether the sentences are ordered to run concurrently or consecutively:

1. The amount of time to be served for parole eligibility on the original sentence;

*****

3. If the inmate has an additional sentence for a crime committed while in the institution, the amount of time to be served for parole eligibility on the additional sentence for the crime committed while in the institution . . . .

3

501 Ky. Admin. Regs. 1:030 § 3(4)(a).

Under this regulation, Smith's 2010 convictions added two years to his parole eligibility date, shifting it from March 2021 to March 2023.  The parties do not contest the calculation of these dates.[3]  Smith alleged in his R.Cr. 11.42 motion that his attorney provided ineffective assistance "by failing to recognize that the sole inducement for [Smith's] plea bargain in this case—concurrent sentencing—was unattainable."  D.E. 8-3 at 11-12.  Smith claims that when he entered his *Alford* plea he did not know it was impossible for his new convictions to leave his original parole eligibility date intact.  *Id*. at 12.  He further claims,

> His attorney did not inform Smith of 501 KAR 1:030, did not inform Smith that the two five-year sentences would be run consecutively to one another and to the life sentence for parole eligibility purposes pursuant to that regulation, and did not inform Smith that his parole eligibility would be extended due to the regulation. Smith's attorney did not inform him that he was, in essence, pleading guilty to the maximum sentence he could receive on the two Class D felony charges since crimes committed while in the institution are calculated as consecutive sentences for parole purposes (regardless of the judgment), and since the parole eligibility for those crimes does not begin to accrue until the inmate becomes eligible for parole on his original sentence.

D.E. 11 at 21.

Smith's second relevant claim in his R.Cr. 11.42 motion was that his counsel rendered ineffective assistance on the assault charge by failing to "conduct reasonable investigation that would have uncovered a meritorious defense."  D.E. 8-3 at 12.  According to Smith, "certain discovery materials provided to a co-defendant in a related NTC riot case included an audio recording of an interview conducted with NTC Officer Jesus Cabrera."  *Id*.  Smith claimed this interview "exonerated" him and "implicated a different inmate."  According to Smith, Officer

---

[3]  Smith becomes parole eligible for his 2001 life sentence after twenty years of incarceration.  Ky. Rev. Stat. § 439.3401(2); 501 Ky. Admin. Regs. 1:030 § 3(1)(e)(4).  Under the regulation, only then does his parole eligibility (set at 20%) begin to accrue—individually—for his 2010 convictions.  *See* 501 Ky. Admin. Regs. 1:030 § 3(1)(c).

4

Cabrera told the interviewer "I know it was Nolan . . . flung the rock; . . . hit me." *Id*. Smith

averred that, had he known about this recorded interview, he would not have pleaded guilty to

the assault charge. *Id*.[4]

The state Circuit Court denied Smith's R.Cr. 11.42 motion on the merits without a

hearing. D.E. 8-3 at 28-31. Regarding Smith's bad-parole-advice claim, the court explained:

> The defendant's issue[] is based on the fact that he disagrees with the calculation
> of his parole eligibility. This does not equate to ineffective assistance of counsel.
> Counsel negotiated a deal for concurrent sentencing, thus placing the defendant in
> the best possible position for parole consideration. The Department [of
> Corrections] calculates parole eligibility according to 501 KAR 1:030 regardless
> of whether the Court orders the sentences to run concurrently or consecutively.

*Id*. at 29. Regarding Smith's failure-to-investigate claim, the court dismissed it because it

consisted of "bare allegations with no factual support." *Id*.

Smith filed a *pro se* appeal of the Circuit Court's decision, and the Kentucky Court of

Appeals affirmed. *Smith v. Commonwealth*, No. 2013-CA-000532-MR, 2014 WL 3722010 (Ky.

Ct. App. July 25, 2014), *reh'g denied* (Dec. 2, 2014), filed at D.E. 8-4 at 32-37. On August 12,

2015, the Kentucky Supreme Court denied discretionary review. D.E. 8-5 at 39.[5]

On August 26, 2015, Smith, through counsel, filed a petition for a writ of habeas corpus

in this Court. D.E. 1. Smith requests an evidentiary hearing. *Id*. at 37; D.E. 12.

As discussed in Part II below, the undersigned recommends that Smith's petition be

dismissed as time-barred. This Recommended Disposition will consider (1) Smith's original

timeliness argument regarding his faulty advice claim under 28 U.S.C. § 2244(d)(1)(D); (2)

---

[4] The record contains an audio recording of this interview, which the Court has reviewed. *See* D.E. 10.

[5] By operation of R.Cr. 12.05 and Kentucky Rule of Civil Procedure 76.30(2)(B), an order from the Kentucky
Supreme Court denying discretionary review "becomes final immediately upon denial of the motion."

Smith's new argument—raised for the first time in his reply brief—that his exhaustion of administrative remedies affected the running of the statute of limitations on his faulty advice claim; (3) the timeliness of his failure-to-investigate claim, and (4) his alternative argument that actual innocence or some other form of equitable tolling applies to his faulty advice claim. As an alternative basis for denying the petition, the Court will also explain (in Part III) why Smith's claims fail on the merits.

## II.  Statute of Limitations

### A.  Legal Standards Under AEDPA

A state prisoner has a statutory right to collaterally attack his conviction or sentence. *West v. Bell*, 242 F.3d 338, 346 (6th Cir. 2001). A state prisoner may seek federal habeas corpus relief on the ground that he is being held in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a).

The Antiterrorism and Effective Death Penalty Act, Pub L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), imposes a strict one-year statute of limitations for state habeas petitions:

**(d)(1)** A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

**(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

**(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

**(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> **(D)** the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

> **(2)** The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Smith argues that his petition is timely under § 2244(d)(1)(D).  For both of his ineffective-assistance claims, he asserts that his statute of limitations began to run on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  D.E. 1 at 7; D.E. 11 at 1-2.  When, as here, the petitioner alleges different factual predicates for different habeas claims, the Court must analyze them separately under § 2244(d)(1)(D).  *Ege v. Yukins*, 485 F.3d 364, 373 (6th Cir. 2007).

For his bad-parole-advice claim, Smith pinpoints his factual predicate to November 14, 2011, which is the day

> the Administrator of the Department of Corrections' Offender Information Services wrote a letter to Smith . . . regarding his appeal under the Administrative Review Process.  In that letter, the Administrator informed Smith that the parole eligibility date of March 2023, two years longer than Smith had originally, was, in fact, accurate pursuant to 501 KAR 1:030.

D.E. 1 at 7.

Regarding his failure-to-investigate claim, Smith states that, sometime after he received the November 14, 2011 letter, he "learned, from another inmate's discovery" that the "audio tape of Officer Cabrera implicating inmate Nolan" existed.  *Id*.  Smith does not identify a particular date on which this conversation with the other inmate happened.

7

Using November 14, 2011, as his anchor date, Smith argues that he tolled the statute under 28 U.S.C. § 2244(d)(2) when he filed his R.Cr. 11.42 motion less than a year later on October 30, 2012. Smith's R.Cr. 11.42 claims became exhausted on August 12, 2015, when the Kentucky Supreme Court denied review. At this point, according to Smith, the statute of limitations resumed with fifteen days remaining. Under Smith's theory, his federal petition, filed fourteen days later on August 26, 2015, was timely. *See* D.E. 1 at 7-8.

The statute of limitations is an affirmative defense. The party that asserts that defense—in this case, the Warden—has the initial burden of demonstrating that the statute has run. *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002). However, when the petitioner relies on subsection 2244(d)(1)(D), the petitioner bears the burden of persuading the Court that he has exercised due diligence in his search for the factual predicate of his claim. *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006). Section 2244(d)(1)(D) does not require the maximum feasible diligence, only "due" or "reasonable" diligence in light of the difficulties inherent in the prison environment. *Id.* at 470. A court's "proper task" in evaluating due diligence is "to determine when a duly diligent person in petitioner's circumstances would have discovered" the factual predicate. *Id.* A petition that "merely alleges" the petitioner did not actually know the facts underlying his claim is "insufficient to show due diligence." *Stokes v. Leonard*, 36 F. App'x 801, 804 (6th Cir. 2002) (quoting *In re Boshears*, 110 F.3d 1538, 1540 (11th Cir. 1997)); *see also McDonald v. Warden, Lebanon Corr. Inst.*, 482 F. App'x 22, 29 (6th Cir. 2012). Instead, the petitioner is "required" to provide evidence establishing the date on which he could have discovered the factual predicate through due diligence. *Gillis v. United States*, 729 F.3d 641, 644-45 (6th Cir. 2013); *see also Moore v. United States*, 438 F. App'x 445, 448 (6th Cir. 2011).

8

### B.  Faulty Advice Claim—Smith's Original Argument Under § 2244(d)(1)(D)

This is a claim of ineffective assistance of counsel under *Strickland*.  The "factual predicate" is Smith's attorney's alleged misadvice that the concurrent sentencing Smith obtained through his *Alford* plea would not delay his parole eligibility.  The Court assumes Smith's attorney misadvised him for purposes of this timeliness analysis.  In his original petition to this Court, Smith argued that he learned his attorney had misadvised him when he received a letter from the Kentucky Department of Corrections ("KDOC") on November 14, 2011, confirming that his parole date had changed.  D.E. 1 at 7-8.

The pivotal question under Smith's original timeliness theory is:  did he file his petition within one year of the date he could have discovered the factual predicate of his claim, had he acted with due diligence?  Of course, that period excludes the days that were tolled by his state post-conviction litigation (October 23, 2012, to August 12, 2015), if that is an intervening period.

Smith filed his habeas petition on August 26, 2015.  D.E. 1 at 38.  The AEDPA clock had resumed on August 12.  Fourteen days elapsed between these two dates.  Accordingly, Smith had 351 days before filing his R.Cr. 11.42 motion in which to discover the factual predicates.  Smith filed his R.Cr. 11.42 motion on October 23, 2012.[6]  *Accordingly, if Smith knew or should have known about the factual predicates underlying his habeas claim before November 7, 2011, then his petition is time-barred.*

There are two reasons why Smith cannot rely on § 2244(d)(1)(D) for his faulty advice claim.  First, he has not met his burden of proving the date on which he could have discovered—through due diligence—that his attorney misadvised him.  Second, even if Smith did not bear

---

[6] Smith mailed his motion on October 23, and it was filed on October 30.  Since 2011, Kentucky has observed the "mailbox rule" regarding legal filings by prisoners.  *See* Ky. R. Crim. P. 12.04(5).

9

this legal burden, the record shows he had good reason to know he had been misadvised prior to November 7, 2011.

**1. Smith's Burden of Establishing Diligence**

To invoke subsection 2244(d)(1)(D), the petitioner bears the burden of showing he exercised "due diligence" in his search for the factual predicate of his claim. *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006). To do so, the petitioner must help the court "determine when a duly diligent person in petitioner's circumstances would have discovered" the factual predicate. *Id.* at 470. The petitioner is "required" to provide evidence establishing the date on which he could have discovered the factual predicate through due diligence. *Gillis v. United States*, 729 F.3d 641, 644-45 (6th Cir. 2013).

Smith has not met this burden. According to Smith, his sole inducement for pleading guilty was the promise that his parole date would remain unchanged. D.E. 1 at 4; D.E. 11 at 24. And yet, at the plea colloquy, the trial court cautioned him, "It's a concurrent sentence but it does add problems to you, like PFO eligibility, it may affect parole eligibility, it may affect a number of things." The Court asked whether Smith was "familiar with all of the things [your guilty plea] can affect you with?" Smith answered, "Yes, I am." D.E. 8 at 8; D.E. 10 (video recording of plea colloquy). Smith has not explained why this statement from the court did not put him on notice that his sentence could affect his parole eligibility date despite any contrary advice he received from his lawyer. Nor has he alleged that anything prevented him from investigating the effect of his pleas on his parole eligibility date at any point prior to his administrative appeal of the date change.

The Court has labored to deduce Smith's theory regarding due diligence.  Smith simply provides no information to support any finding of diligence following his conviction.  He was clearly put on notice by the trial court of a possible change in his parole eligibility date.  But the record is devoid of information as to any steps he took, tried to take, or was prevented from taking following the notice he was given during his plea colloquy on July 8, 2010.  The next date of significance Smith identifies is November 14, 2011, the date of the KDOC letter confirming the effects of the administrative regulation.  The record is devoid of evidence supporting any finding of due diligence on Smith's part from July 8, 2010, to November 14, 2011.  "[I]t is impossible to infer from [the petitioner's] brief whether and to what extent he exercised due diligence."  *Bey v. Capello*, 525 F. App'x 405, 408 (6th Cir. 2013).  Having failed to carry his burden to establish when a duly diligent person in his position would have discovered he had been misinformed about the effect of his pleas on his parole eligibility date, Smith cannot rely upon subsection 2244(d)(1)(D).

Furthermore, as explained below, the correspondence between Smith and KDOC reveals that Smith was alerted to the parole eligibility date issue prior to receiving the November 14, 2011 letter.  Smith states in a prior letter to the Warden that he checked his parole eligibility date on the computer.  D.E. 8-6 at 3 (October 11, 2011 letter).  He nowhere reveals when he checked this information, or how long it had been available.  In short, Smith makes no attempt to establish (1) when the crucial information first became capable of being discovered, had he exercised due diligence, or (2) why he could not have gathered the crucial information sooner.  Accordingly, under existing case law he cannot avail himself of § 2244(d)(1)(D).

**2. Evidence in the Record**

Second, even if Smith did not bear the burden of showing when he could have discovered his factual predicate had he been duly diligent, his argument runs aground on the record itself. In other words, the record reveals that Smith either knew or could have known (through reasonable diligence) the facts underlying his faulty advice claim prior to November 7, 2011.

The record refutes Smith's original argument that he only learned about how 501 KAR 1:030 § 3(4)(a) affected his parole eligibility date when he received the November 14, 2011 letter from the KDOC. D.E. 1 at 7-8. According to Smith, this letter told him that his 2023 eligibility date "was, in fact, accurate." *Id.* at 7. As Smith's wording implies, this letter was not the first correspondence between Smith and the KDOC regarding the change to his parole eligibility date.

First, the record contains a Reclassification Custody Form dated September 26, 2011. D.E. 8-6 at 2. This form, at some point signed by Smith, indicates his parole eligibility date would be March 21, 2023. *Id.* Second, on October 11, 2011, the Warden received a letter from Smith. It states,

> To whom it may concern: I'm writing in concerns of my parole eligibility date. . . . I noticed on the [Reclassification Custody Form that] I don't go up for parole until 2023[,] but that's not right because I go up in 2021. I haven't received any new time that is consecutive. Also, my parole eligibility date is on the computer as 2023 and I'd appreciate it if that's fixed too. . . .

*Id.* at 3.

Third, also on October 11, Amy Roberts at Institutional Offender Information Services wrote Smith an Institutional Offender Information Services Response that explained the operation of 501 KAR 1:030 in Smith's case. D.E. 8-6 at 4-5. This response letter quotes the relevant portion of the regulation and specifies his parole eligibility date as March 21, 2023.

Smith signed this response letter on October 18, 2011, and indicated he was "not satisfied" with this initial response from the KDOC.  *Id*. at 5.

Fourth, also on October 18, Smith wrote a typed "Memorandum" of appeal to Offender Information Services.  D.E. 8-6 at 6.  He asserted that "[t]he Institution has disregarded the fact that my subject sentences were directed to be served concurrently.  The two subject Class D felonies have been improperly construed as consecutive sentences, resulting in [an] additional two-year period before parole eligibility."  *Id*.

This correspondence reveals that Smith became aware of the operation of the regulation in his case sometime between September 26 and, at the latest, October 18, 2011.  By October 18, 2011, he had seen and signed the Reclassification Custody Form, checked his parole eligibility date on the computer, written a letter to the Warden, been advised specifically regarding the operation of the regulation, and pursued an appeal.  The November 14 letter on which Smith hangs his hat simply restates the content of the Response form that Smith signed on October 18, and concludes, "Your parole eligibility date of March 2023 is accurate.  I'm sorry my response could not be more favorable."  *Id*. at 7.

The record shows Smith knew "the factual predicate" for his claim prior to November 7, 2011, which is the latest possible date that would render his petition timely.  *See* 28 U.S.C. § 2244(d)(1)(D).  The KDOC's denial of his administrative appeal is not the factual predicate underlying his claim.  Smith is not challenging the decision of the KDOC.  The factual predicate of his faulty advice claim is the fact—assumed to be true for the sake of analysis—that Smith's attorney misinformed him that he would remain eligible for parole on his riot-related convictions on the same date that he became eligible for parole on the murder conviction.

According to the record, by October 18, 2011, at the latest, Smith possessed and read the text of the Kentucky regulation that contradicted his attorney's misadvice. D.E. 8-6 at 5. By quoting and explaining 501 KAR 1:030, the response letter that Smith signed on October 18 provided all the information necessary to determine whether his attorney had given him bad advice. At that time, Smith had reason to know—through due diligence—that his attorney had misinformed him. Smith had one year from that date to either file his habeas petition or toll the statute by filing for state post-conviction relief. *See* 28 U.S.C. § 2244(d)(2). In other words, his federal habeas deadline expired by October 18, 2012. No event occurred during that one-year period that would toll the AEDPA clock.

It was reasonable for Smith to write the KDOC first and attempt to get his parole eligibility date corrected. But even by the time he exhausted his administrative appeal with the KDOC (as memorialized in the November 14, 2011 letter) over ten months remained on the AEDPA clock. Smith could have filed a state or federal post-conviction motion within those ten months, but he did not. He did not file his R.Cr. 11.42 motion until October 23, 2012—a year and five days after the very latest date on which he had reason to know the factual predicate of his bad-parole-advice claim. Accordingly, under the theory Smith asserts in his original petition, this claim is time-barred.

### C. Faulty Advice Claim—Smith's Alternative Theories

In his reply brief, Smith posits three additional reasons why his bad-parole-advice claim is not time-barred. D.E. 11 at 5. He asserts "there are three ways to analyze this issue, all of which lead to the result that the clock did not begin to run on Smith's misadvice until November 14, 2011." *Id.*

14

None of these three theories appear in Smith's original petition, which was prepared by counsel. The Warden has not had an opportunity to respond to them. The undersigned considers them waived. The Sixth Circuit has consistently held that arguments made for the first time in a reply brief are waived. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). However, even on the merits these theories fail for the reasons discussed below.

**1. Does A Final Administrative Decision Create the Factual Predicate?**

Under the first new theory in his reply brief, Smith argues that courts in other circuits facing similar scenarios "have generally found that the 'factual predicate of the claim' was not known until the administrative appeal was finally resolved." D.E. 11 at 5. In support, Smith cites four non-binding cases from four federal Courts of Appeals. Each case involves a direct challenge to an administrative decision.

He first cites a Tenth Circuit case, *Dulworth v. Evans*, 442 F.3d 1265 (10th Cir. 2006). In *Dulworth*, a state prisoner petitioned under 28 U.S.C. § 2241 to overturn a prison board's imposition of "escape points" that placed him in a more onerous prisoner classification. *Id*. at 1266-67. The court held that the "factual predicate" for his claim did not arise until he exhausted his administrative appeals. *Id*. at 1268-69. The Court reasoned:

> In similar contexts courts have recognized that timely and diligent exhaustion of *administrative* remedies does not work to a petitioner's disadvantage in determining when the one-year limitation period commences under § 2244(d)(1)(D). Rather, they have determined that the date on which the factual predicate of a petitioner's claim could have been discovered through the exercise of due diligence—thus commencing the limitation period—is the date that the denial of his administrative appeal becomes final. . . . [W]e conclude that where, as here, a petitioner timely and diligently exhausts his administrative remedies, § 2244(d)(1)(D)'s one-year limitation period does not commence until the decision rejecting his administrative appeal becomes final.

15

Our decision here is buttressed by consideration of the general requirement that a petitioner under § 2241 must exhaust available state remedies. *Montez v. McKinna*, 208 F.3d 862, 866 (10th Cir. 2000). This requirement extends to the exhaustion of *administrative* remedies as well. *See, e.g.*, *Wilson v. Jones*, 430 F.3d 1113, 1118 (10th Cir. 2005); *Moore v. Olson*, 368 F.3d 757, 758 (7th Cir. 2004); *Clonce v. Presley*, 640 F.2d 271, 273-74 (10th Cir. 1981) (stating that a prisoner must "exhaust the respective state and administrative remedies before challenging his state or federal custody by habeas corpus"). As such, if § 2244(d)(1)(D) was construed to commence from the date when petitioner first learns of the initial decision giving rise to his § 2241 claim, the limitations period would run while he attempted to exhaust his administrative remedies, i.e., while he appealed the initial decision. . . . . Such a construction would lead to a perverse result indeed, effectively shielding from federal habeas review those administrative appeals that—for whatever reason—do not become final within the one-year limitations period. This cannot be so.

*Id*.

Smith cites three similar cases from other jurisdictions. D.E. 11 at 5. In *Shelby v. Bartlett*, 391 F.3d 1061 (9th Cir. 2004), the Ninth Circuit considered a state prisoner's challenge to a prison disciplinary proceeding. The court found that under § 2244(d)(1)(D) the statute of limitations began to run on the date the prisoner received notice of the denial of his administrative appeal. *Id*. at 1066. In *Wade v. Robinson*, 327 F.3d 328 (4th Cir. 2003), the Fourth Circuit considered a state prisoner's challenge to a parole board's rescindment of his good conduct credits at his parole revocation. The court held that the "factual predicate" of the prisoner's claim was the date his parole revocation became final. *Id*. at 333. In *Cook v. New York State Div. of Parole*, 321 F.3d 274 (2d Cir. 2003), the Second Circuit considered a state prisoner's challenge to the revocation of his parole. The court held that the statute of limitations under § 2244(d)(1)(D) began to run when the petitioner was "notified that the administrative decision to revoke his parole had become final." *Id*. at 280.

16

Each of these cases can be distinguished on the basis that Smith's claim is an ineffective-assistance-of-counsel claim, not a challenge to the decision of an administrative body.[7]  When a state habeas petitioner challenges an adverse administrative ruling, the final administrative decision becomes the factual predicate under 28 U.S.C. § 2244(d)(1)(D).  *See, e.g.*, *Brown v. Barrow*, 512 F.3d 1304, 1308 (11th Cir. 2008) (finding that a parole board's final decision created the factual predicate for a habeas claim challenging the parole board's decision); *Ali v. Tennessee Bd. of Pardon & Paroles*, 431 F.3d 896, 898-99 (6th Cir. 2005) (same); *Redd v. McGrath*, 343 F.3d 1077, 1082 (9th Cir. 2003) ("[T]he factual basis of [the defendant's] habeas claims was the Parole Board's denial of his administrative appeal.").

Smith's argument appears to be that, although the administrative decision is not the ultimate factual basis of his claim, the KDOC review process is intertwined with his *Strickland* claim.  An administrative decision in Smith's favor would have obviated his need to petition for habeas relief.  Smith argues that, had he filed his habeas petition before the KDOC completed its appeal process, the government would be arguing now that he failed to exhaust his state administrative remedies.  D.E. 11 at 7.  One could also suggest that a failure to apply *Dulworth*'s reasoning to cases like this would cause the "timely and diligent exhaustion of administrative remedies" to "work to the petitioner's disadvantage" under the statute of limitations.  *Dulworth*,

---

[7] It matters not that the Tenth Circuit analyzed the case under § 2241 rather than § 2254.  As the Sixth Circuit has explained,

> Courts interpret § 2241 as the statutory grant of authority to issue habeas writs, and § 2254 as implementing that authority with respect to state prisoners.  *See White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004) ("Although the text of either statute would appear to confer jurisdiction . . . Section 2254 is properly understood as in effect implementing the general grant of habeas corpus authority found in § 2241, as long as the person is in custody pursuant to the *judgment* of a state court . . . ." (citation and quotation marks omitted) (emphasis in original)).

*Allen v. White*, 185 F. App'x 487, 489 (6th Cir. 2006).

442 F.3d at 1268.   Of course, a timely-filed *protective* habeas petition is an option in such a situation.

Although this argument carries some appeal, it is at odds with the language of § 2244(d)(1)(D).  This provision ties the running of the AEDPA clock to "the date on which the factual predicate of *the claim or claims presented* could have been discovered through the exercise of due diligence."

Here, there is no avoiding the fact that Smith's claim is a *Strickland* claim.  A decision by the KDOC cannot be the factual predicate for a *Strickland* claim.  The only possible factual predicate under § 2244(d)(1)(D) is the alleged fact that Smith's attorney misadvised him prior to his guilty plea.  As explained above in Section II.B, Smith had reason to know that his counsel misadvised him as soon as the KDOC alerted him by letter in October 2011 to the text of 501 KAR 1:030 § 3(4)(a) and how this regulation operated in his case.  The cases Smith cites in making this argument simply do not apply to his ineffective-assistance claim.

**2.  Do Prison Grievance Procedures Toll the Statute of Limitations?**

Smith offers a second theory that reaches the same result using a different rationale under 28 U.S.C. § 2244(d)(1)(D).  According to Smith, "the only other habeas corpus case to have addressed an issue of this nature has held that while the [limitations] period began to run on the date of the original [administrative] decision, 'the timely pendency of prison grievance procedures would have tolled the one-year period.'"  D.E. 11 at 6 (citing *Kimbrell v. Cockrell*, 311 F.3d 361, 364 (5th Cir. 2002)).

The court in *Kimbrell* addressed a state prisoner's challenge to a prison disciplinary committee's revocation of his good-time credits.  The court held that the petitioner's factual

predicate arose at the end of the hearing, when the committee announced its decision.  The court noted in dicta that filing grievance procedures "would have tolled" the statute of limitations. *Kimbrell*, 311 F.3d at 364.  But the prisoner in *Kimbrell* did not initiate any grievance procedures until after the AEDPA limitations period had run.  Unlike the Tenth Circuit in *Dulworth*, the court declined to define Kimbrell's "factual predicate" as the conclusion of the "administrative review process."  *Id*.  Instead, courts that follow *Kimbrell* have held that a prisoner's administrative appeal tolls AEDPA's statute of limitations.  *See, e.g.*, *Bell v. Sec'y, Dep't of Corr.*, No. 8:06-CV-2377-T-30MAP, 2008 WL 4790730, at *5-6 (M.D. Fla. Oct. 29, 2008).

Under this line of reasoning, Smith's "factual predicate" arose when he learned that his parole eligibility date had shifted.  This occurred in September 2011 at the earliest or October 18, 2011, at the latest, which is the date Smith filed his administrative appeal against the KDOC's decision.  However, under this theory, Smith's administrative appeal tolled the statue of limitations until he learned his appeal was denied on November 14, 2011.

*Kimbrell* conflicts with the law in this Circuit.  When a prisoner challenges an administrative decision, such as denial of parole, the Sixth Circuit applies § 2244 the same way as the *Dulworth* court, not the courts that follow *Kimbrell*.  When a prisoner files an administrative appeal, the Sixth Circuit considers the final administrative decision to be the "factual predicate" under § 2244(d)(1)(D).  *Ali v. Tennessee Bd. of Pardon & Paroles*, 431 F.3d 896, 898-99 (6th Cir. 2005).  And subsequent *judicial* review of that administrative decision may toll the statute of limitations under § 2244(d)(2).  *Id*. at 899.  Smith's cited authorities fail to establish that anything besides judicial review (such as prison grievance procedures) may pause the AEDPA clock under § 2244(d)(2) in this Circuit.

Smith's second theory from his reply brief is also discordant with the language of § 2244. Section 2244(d)(2) tolls the statute of limitations for "state post-conviction or other collateral review with respect to the pertinent judgment or claim." Here, the "pertinent judgment"—the one Smith seeks to overturn—is Smith's conviction pursuant to an *Alford* plea. The KDOC's decision is not the "pertinent judgment." Unlike Smith's habeas petition, his administrative appeal was not a post-conviction or collateral review action challenging his conviction on his plea. In this context, his administrative appeal is not an action that tolls the statute of limitations under § 2254(d)(2).

Smith attempts to link his *Kimbrell* theory to Sixth Circuit case law by claiming that tolling the statute of limitations during his administrative appeal would be consistent with the Sixth Circuit's "interpretation of the Prison Litigation Reform Act of 1995." D.E. 11 at 6 (citing *Brown v. Morgan*, 209 F.3d 595 (6th Cir. 2002)). It is true that the court in *Brown* held that a prisoner's administrative appeal tolled the statute of limitations for a civil-rights action under 28 U.S.C. § 1983. *Brown*, 209 F.3d at 596. The court reasoned that, because the Prison Litigation Reform Act required exhaustion of administrative remedies, a prisoner's federal statute of limitations had to be tolled while state remedies were being exhausted. *Id.* But AEDPA is structured differently. Although AEDPA requires habeas petitioners to exhaust their administrative remedies, AEDPA itself provides a tolling provision at 28 U.S.C. § 2244(d)(2). The language of that provision controls. For the reasons stated above, this theory fails.

**3. Was Smith's Administrative Appeal an Impediment to Filing?**

Smith's third new theory requires little discussion. In his reply brief, Smith asks the Court to view his "administrative appeals process" as "an impediment to filing" under 28 U.S.C.

§ 2244(d)(1)(B).  D.E. 11 at 6.  He theorizes that "Kentucky authority created an 'impediment to filing an application' which was not removed until November 14, 2011, when [the] administrative appeals process was concluded."  *Id.* at 7.  Smith provides no case law for the proposition that a state administrative appeals process qualifies as a government impediment under § 2244(d)(1)(B).  Furthermore, under the language of § 2244(d)(1)(B), the governmental impediment must be an "action in violation of the Constitution or laws of the United States."  Smith makes no argument that the KDOC appeals process violates federal law.  His reliance upon subsection 2244(d)(1)(B) is unavailing.

### D.  Timeliness of Smith's Failure-to-Investigate Claim

Having considered and rejected Smith's four theories regarding the timeliness of his faulty advice claim, the Court now turns to his second *Strickland* claim.

Smith's failure-to-investigate claim is also untimely.  Again, Smith relies on 28 U.S.C. § 2244(d)(1)(D), under which the statute runs from the date on which the "factual predicate of the claim . . . could have been discovered through the exercise of due diligence."  Smith avers that sometime after November 14, 2011, he learned about the existence of Officer Cabrera's audio interview from a codefendant.  D.E. 1 at 7; D.E. 11 at 8-9.  As explained above in Part II.B, in order for his petition to be timely, Smith must prove he could not have discovered, through due diligence, the factual predicate until *after* November 7, 2011.

Smith's theory is that the audio recording ***was*** included in the pre-trial discovery materials the Commonwealth provided to his counsel, but that his counsel failed to discover (or appreciate the importance of) the recorded interview.  *See* D.E. 8-3 at 12, 46-47, 52-54, 56.  There is one sentence in his § 2254 motion that seems to suggest the Commonwealth withheld

the recording.  D.E. 1 at 7 ("[Smith] cannot be expected to know of discovery that was not provided in his own case.").  But Smith clarified in his reply brief that he was not asserting a *Brady* claim of governmental suppression of evidence.  D.E. 11 at 29 n.10.  He refers to a list of discovery materials that were provided to his counsel—including "67 printed pages, two cassette tapes, six CDs, [and] 13 DVDs—and "assume[s] that the audio recording in question is one of the recordings" mentioned in this list.  *Id*.  Similarly, in his motion to expand the record, Smith refers to the recording as "exculpatory evidence in the discovery."  D.E. 12 at 2.

Smith bears the burden of proving that he could not have discovered the recording prior to November 7, 2011, through the exercise of due diligence.  *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006).  According to his theory, the recorded interview was contained in his own pre-trial discovery materials.  Smith therefore must provide evidence that a person in his situation could not have discovered the exculpatory recording.  *Id*. at 470-71.  He must do more than simply assert that he did not know the "factual predicate" of his § 2244(d)(1)(D) failure-to-investigate claim.  *Stokes v. Leonard*, 36 F. App'x 801, 804 (6th Cir. 2002).  And he must provide evidence establishing the date on which he could have discovered the evidence through due diligence.  *Gillis v. United States*, 729 F.3d 641, 644-45 (6th Cir. 2013).

Smith has done none of these things.  First, he fails to provide evidence establishing the date on which he could have discovered the recording through due diligence.  In his sworn *pro se* R.Cr. 11.42 motion, verified under penalty of perjury, Smith states that the recorded interview of Officer Cabrera was among "certain discovery materials provided to a codefendant in a related NTC riot case."  D.E. 8-3 at 12.  This sworn description provides no guidance whatsoever regarding when he discovered the audio recording.

Subsequently, in his unsworn brief to the Kentucky Court of Appeals, Smith elaborates

on how he became aware of the recording:

> [D]uring the interim of this year, Smith was able to talk to others who were
> criminally charged in the riot.  One of those prisoners was Bobby Hoskins, who
> was still facing charges stemming from the riot and who was diligently viewing
> his discovery materials to assist his attorney in his case. . . .
>
> [Hoskins] discovered a taped interview [in which Officer] Cabrera stated,
> unequivocally three times, that it was another prisoner named "Nolan," not Smith,
> who had flung the rock that hit him in the head.  Hoskins immediately brought
> this matter to Smith's attention.

D.E. 8-3 at 46-47.  Smith claimed he was surprised to learn about the interview; he "was never

made aware of this statement, presum[p]tively, because counsel did not conduct any

investigation into the [discovery materials], despite stating that he had." *Id*. at 53.  Smith told the

Kentucky appellate court that  he "presumed" the discovery materials in his case were identical

to the ones given to Hoskins, which meant that his attorney "would have discovered" Officer

Cabrera's recorded statement had he "properly investigated . . . and listened to all the CDs." *Id*.

at 54.

Smith told the Kentucky Court of Appeals that he talked to Hoskins "a year and a half"

after a date he sets as "November 12, 2010," which his counsel indicates should be "July 12,

2010." *Id*. at 52; D.E. 11 at 9 n.2.  A year-and-a-half after that date would be at the beginning of,

or well into, 2012.  However, Smith has provided no evidence, such as a sworn statement or

declaration, to corroborate this timeline.

Because Smith provides no actual evidence regarding when he discovered the recording

or why he could not have discovered it earlier, he fails to meet his burden under § 2244(d)(1)(D).

Smith "has presented no facts, below or here, as to [what date he could have discovered the

recording through due diligence].  Such a showing is required." *Gillis*, 729 F.3d at 644-45.  "[I]t is impossible to infer from [the petitioner's] brief whether and to what extent he exercised due diligence." *Bey v. Capello*, 525 F. App'x 405, 408 (6th Cir. 2013); *see also Eberle v. Warden*, 532 F. App'x 605, 610-11 (6th Cir. 2013).

  Second, accepting as true Smith's account of how he discovered the recording (as contained in his brief to the Kentucky Court of Appeals), his own account shows he *could* have discovered the recording through due diligence.  Smith argues in his reply brief that the Court should consider that he was incarcerated during the period leading up to his plea deal.  D.E. 11 at 12.  Because he was confined, he argues he "could only review that which was provided to him by trial counsel." *Id.*  He asks the Court to find that, considering the fact he was incarcerated, he was sufficiently diligent and could not have discovered the recording because his attorney withheld it from him. *Id.*

  However, Smith's own story about discovering the recording through Hoskins undermines this theory.  Smith's codefendant Hoskins was also presumably incarcerated from before the riot through the period that he discovered Officer Cabrera's interview.  Yet Hoskins was able to obtain—and even listen to—the recordings in prison.  Accepting Smith's story about Hoskins as true suggests that Smith also could have reviewed his discovery materials in prison. He can derive no benefit from § 2244(d)(1)(D).

  Third, because the recording was in Smith's discovery materials, he could have discovered it through due diligence even before he pleaded guilty.  In *Townsend*, the Sixth Circuit held that discovery materials that defense counsel possessed but withheld from the defendant are not "new" under § 2244(d)(1)(D). *Townsend v. Lafler*, 99 F. App'x 606, 609 (6th

24

Cir. 2004).  Smith has cited no case law to the contrary.  Because evidence contained in defense

counsel's pre-trial discovery materials cannot form the basis of a "factual predicate" under

§ 2244(d)(1)(D), the "latest" triggering event under § 2244 would be the date on which Smith's

judgment became final—August 13, 2010.  Over two years elapsed between his judgment and

his R.Cr. 11.42 post-conviction motion.  Under these facts, AEDPA's statute of limitations bars

Smith's failure-to-investigate claim.

Fourth, Smith's claim is also contradicted by his sworn statements at his plea colloquy.

At the hearing, Smith told the court his attorney had reviewed his discovery materials with him:

Court: [The Public Defender's Office] went to the prosecutors and asked to show them what evidence they had against you.  What were they going to present to a jury if they had to go to trial—called the discovery.  I think there was about 3,000 pages or something like that at this point.  Did you get a chance to look at that discovery?

Smith: Yes, I did.

Court:  So you know what the Commonwealth has and intends to show the jury?

Smith:  Yes, sir.

Court:  Did Mr. Beckett go over that with you?

Smith:  Yes, sir.

*See* D.E. 8 at 5-6 (transcription of plea colloquy); D.E. 10 (disc containing video of plea

colloquy).  Smith's own sworn admission that he had "a chance to look at" his voluminous

discovery (and that his attorney reviewed it with him) shows he had the opportunity to discover

the recorded interview even before he pleaded guilty.  For each of these reasons, Smith has not

borne his burden of establishing due diligence.  He cannot lean on § 2244(d)(1)(D).

25

For each of these reasons, Smith's failure-to-investigate claim is barred by AEDPA's statute of limitations. Having considered and rejected each of Smith's theories regarding the timeliness of his *Strickland* claims under 28 U.S.C. § 2244(d), the Court now considers his arguments for equitable tolling.

### E.  Equitable Tolling

In the event the Court finds Smith's claims untimely under § 2244(d), Smith argues the AEDPA deadline should be tolled because new evidence (*i.e.*, the Cabrera interview) shows he is actually innocent of the charges to which he pleaded guilty. D.E. 1 at 8; *see also Schlup v. Delo*, 513 U.S. 298, 326-27 (1995); *Souter v. Jones*, 395 F.3d 577, 588-89 (6th Cir. 2005). Although a court may equitably toll AEDPA's statute of limitations on the ground of actual innocence, such tolling is an extraordinary and rare remedy. *Schlup*, 513 U.S. at 321, 327; *McCray v. Vasbinder*, 499 F.3d 568, 577 (6th Cir. 2007). "To be credible, such a claim requires a petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—" that was not available at trial. *Schlup*, 513 U.S. at 324; *see also Cleveland v. Bradshaw*, 693 F.3d 626, 636 (6th Cir. 2012) ("[A]dditional evidence of actual innocence must be both new and reliable before it can be considered."). A petitioner who pleaded guilty may assert a *Schlup* claim. *Connolly v. Howes*, 304 F. App'x 412, 417 (6th Cir. 2008).

Tolling based on new evidence requires the petitioner to show more than that the evidence is new and reliable. *See Cleveland*, 693 F.3d at 636-642. The petitioner also must show that it is more likely than not that no reasonable juror, having seen the evidence, would have found the petitioner guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327. "Actual

innocence" in this scenario "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Cleveland*, 693 F.3d at 633.

Smith's petition argues that his "actual innocence to the charges for which he was convicted justifies equitable tolling in this case." D.E. 1 at 8; *see also* D.E. 11 at 14-16. Smith points out that he maintained his innocence throughout the pre-trial proceedings and entered an *Alford* plea. By doing so he admitted that the Commonwealth's evidence "strongly indicates guilt" and his interests were "best served by a guilty plea." D.E. 8-3 at 5.

It is important to note that Smith's actual innocence claim could only apply to his assault conviction. Smith makes no argument that he has new evidence that would clear him of participating in a riot that resulted in substantial property damage.[8] In fact, his allegedly new evidence—Officer Cabrera's recorded interview—corroborates the fact that the riot occurred and the facilities were damaged.[9]

For two independent reasons, the recorded interview fails to meet the standard of *Schlup*.[10]

First, Smith bears the burden of showing that his evidence is new, and he has not carried this burden. *See Cleveland*, 693 F.3d at 636. The recording cannot be "new" if his counsel possessed it before he pleaded guilty. *See Townsend*, 99 F. App'x at 609 (noting that evidence

---

[8] As explained in footnote 1, the indictment charged Smith under the "substantial property damage" provision of the first-degree riot statute, not the provision that requires physical injury to a non-rioter (*e.g.*, Officer Cabrera). *See* Ky. Rev. Stat. § 525.020; D.E. 8-3 at 1.

[9] In the interview, Officer Cabrera reports the rioting prisoners were "busting stuff," including kicking down a door. *See* D.E. 10.

[10] The parties do not dispute that the evidence is "reliable." *See Schlup*, 513 U.S. at 324; *Cleveland*, 693 F.3d at 638.

possessed by defense counsel but not given to the defendant is not "new"). As discussed in Part II.D, *supra*, Smith's theory before the Kentucky courts (and now in his reply brief) was that the audio interview was contained in the voluminous discovery materials provided to his counsel. *See* D.E. 11 at 11-12. The lone fact that his evidence is not new torpedoes his actual-innocence tolling claim.

To blunt this conclusion, Smith draws on language from *Cleveland* to argue that the recorded interview constitutes "new" evidence under *Schlup*. D.E. 11 at 15 (citing *Cleveland*, 693 F.3d at 633). Smith argues that "the focus should be on the fact that this new evidence was not considered by Smith when entering his *Alford* plea and was not presented to the trier of fact." *Id*. He interprets the *Cleveland* court as holding that "newly presented" evidence, in addition to newly discovered evidence, is "sufficient to meet the requirements of *Schlup*." *Id*. However, regardless of whether Smith "considered" the recording, the evidence was in his attorney's possession and was therefore available to Smith. The petitioner in *Cleveland* had been convicted after a jury trial. The *Cleveland* court's concern with whether the exculpatory evidence had been "presented" to the trier of fact is simply not applicable to a case in which the defendant pleaded guilty and contends that the evidence was included in the discovery materials possessed by his counsel. Additionally, even if there is such a thing as "newly presented evidence" in a case involving a guilty plea, the *Cleveland* court expressly declined to decide whether there was any "meaningful difference" between "newly discovered" and "newly presented" evidence. *Cleveland*, 693 F.3d at 633.

Second, and more to the point, even if the evidence was new, the Cabrera interview is not so compelling to create the likelihood that no reasonable juror would have found him guilty. In

his R.Cr. 11.42, motion, Smith quoted only ten words of the interview: "I know it was Nolan . . . flung the rock; . . . hit me." D.E. 8-3 at 12. In his federal petition, he supplies a slightly longer transcription:

> Cabrera: I know it was Nolan.
>
> Interviewer: Nolan is the one that…
>
> Cabrera: That got—he flung the rock…
>
> Interviewer: Is he the one that flung the rock at you?
>
> Cabrera: Yeah, that hit me.

Audio Recording, 5:37.

D.E. 1 at 29.[11] The Warden supplies a longer and more accurate excerpt:

> Cabrera: We tried to get the door closed behind us but they [the inmates] grabbed a hold of it and jerked it out and they were throwing stuff in there. That's when I got hit.
>
> Interviewer: Yeah.
>
> Cabrera: Uh, T.J., I think, he got hit, too, with a pop can on the head. Uh, and that was Nolan.
>
> Interviewer: Nolan is the one that . . .
>
> Cabrera: That got, he flung, he flung [the] rock.
>
> Interviewer: Is he the one that flung the rock that [hit][12] you, that . . .

---

[11] Nowhere in his federal filings has Smith explained his statement to the Kentucky Court of Appeals that Officer Cabrera "stated, unequivocally three times," that it was another prisoner who had struck Officer Cabrera with a rock. D.E. 8-3 at 46-47. Instead, Smith's arguments center on this single brief exchange.

[12] The transcription in the Warden's brief does not include the word "hit," but the Court believes the interviewer asked Officer Cabrera whether Nolan was "the one that flung the rock that hit you" because Cabrera answered in the affirmative—"Yeah, that hit me." *See* D.E. 10 (disc containing audio recording of interview).

Cabrera: Well he, yeah, that hit me. And maybe there was a couple other ones that I don't [coughs], I mean, if I saw their face [sic] I'd know who they are, but I don't know them by name. Uh.

Interviewer: Well, sometime today I'm going to do a printout of every inmate that's at Northpoint.

Cabrera: Yeah.

Interviewer: So it's going to be a little time consuming.

Cabrera: That's, I'll, I remember the faces.

Interviewer: Ok.

Cabrera: I remember the faces, yeah, I can do that.

(5:22-6:13).

D.E. 8 at 27-28.

Having reviewed the recording, the undersigned agrees with the Warden that the interview is not quite the silver bullet Smith alleges it to be. Although Officer Cabrera does appear to identify Nolan as "the one that flung the rock that hit [him]," Officer Cabrera's references to "a couple other ones" and how "they were throwing stuff" suggests that other prisoners (perhaps including Smith) may also have thrown objects at the officers. The recording also reflects that Officer Cabrera was unable to remember the names of all the rioting prisoners. The recording, by itself, does not sufficiently rule out the possibility that Smith threw an object that struck Officer Cabrera. Even Smith, in his reply brief, states that Officer Cabrera names another prisoner as "the one who flung the object at him . . . without specifically exonerating Smith." D.E. 11 at 29.

In short, the recording contains unresolved ambiguities. Hearing the interview would not sufficiently have prevented a jury from convicting Smith of third-degree assault. The Cabrera

interview is not the type of clear-cut evidence that satisfies the *Schlup* standard. *Schlup*, 513 U.S. at 324. Smith bears the burden to justify equitable tolling. He has not proven that his case warrants equitable tolling of the AEDPA deadline for actual innocence.

In his reply brief Smith also invokes equitable tolling under *Holland v. Florida*. D.E. 11 at 16. In *Holland*, the Supreme Court explained that a court may equitably toll AEDPA's statute of limitations if the petitioner shows both (1) that he has been pursuing his rights diligently and (2) that some extraordinary circumstance stood in his way and prevented timely filing. *Holland v. Florida*, 560 U.S. 631, 649 (2010).

Smith has not shown that he has been pursuing his rights diligently. *See Downs v. McNeil*, 520 F.3d 1311, 1323 (11th Cir. 2008) (discussing diligence). His administrative appeal occurred in October and November 2011. He did not seek any type of post-conviction relief until he filed his *pro se* R.Cr. 11.42 motion in October 2012. He does not explain how he was pursuing his rights during this lengthy delay. *See Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 751 (6th Cir. 2011) (finding that an unexplained several-months delay in filing for relief is incongruous with diligence under *Holland*); *Griffin v. Rogers*, 308 F.3d 647, 651-52 (6th Cir. 2002) (explaining how a state prisoner can file a protective habeas petition to toll the statute of limitations when not all claims are fully exhausted).

Nor has he pointed to an extraordinary circumstance (such as mental illness or attorney misconduct) that stood in his way to prevent timely filing. *See Robertson v. Simpson*, 624 F.3d 781, 785 (6th Cir. 2010) (discussing the requirements for an "extraordinary circumstance"). Smith cannot lean on *Holland*.

For all the reasons discussed above, the undersigned finds that Smith's petition is untimely.

### III. The Merits of Smith's *Strickland* Claims

Even if Smith's claims were timely filed, they would fail on the merits. Assuming that counsel misadvised Smith about his parole eligibility date, and assuming that his counsel overlooked the recorded interview in the discovery materials, these claims fail under AEDPA and *Strickland*.

### A. Legal Standards for an Ineffective-Assistance Claim Under § 2254

### 1. AEDPA Deference

The Antiterrorism and Effective Death Penalty Act, Pub L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), applies to all habeas corpus petitions filed after April 24, 1996, and requires "heightened respect" for legal and factual determinations made by state courts. *See Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). Section 2254(d), as amended by AEDPA, provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This is a "highly deferential" standard of review that is "difficult to meet." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). This Court must presume that all of the state court's

factual findings are correct and can be rebutted only by "clear and convincing evidence." *Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003), *cert. denied*, 543 U.S. 1080 (2005); 28 U.S.C. § 2254(e)(1).  Legal conclusions made by state courts also receive substantial deference under AEDPA.  The Supreme Court has recently reiterated that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents."  *Nevada v. Jackson*, 569 U.S. ___, 133 S. Ct. 1990, 1992 (2013) (per curiam) (internal quotation marks omitted).  The Court has also reiterated that "circuit precedent does not constitute clearly established Federal law."  *Parker v. Matthews*, 567 U.S. ___, 132 S. Ct. 2148, 2155 (2012) (internal quotation marks omitted).  In sum, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."  *Woods v. Donald*, 575 U.S. ___, 135 S. Ct. 1372, 1376 (2015).  Therefore, the question before this Court is not merely whether the Kentucky Court of Appeals was incorrect, but whether it was so wrong its treatment of the law and facts was "unreasonable" under these stringent standards.

## 2.  The *Strickland* Standard

An ineffective-assistance-of-counsel claim presents a mixed question of law and fact. *Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003).  To successfully assert an ineffective-assistance claim, a defendant must prove both deficient performance and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).  To prove deficient performance, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." *Strickland*, 466 U.S. at 687.  A defendant meets this burden by showing "that counsel's representation fell below an objective standard of reasonableness" as measured under "prevailing professional norms" and evaluated "considering all the circumstances." *Id.* at 688.

In order to prove prejudice under the second prong of *Strickland*, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.  When evaluating prejudice, courts generally must consider the "totality of the evidence." *Id.* at 695.

To satisfy the "prejudice" requirement, a defendant who pleaded guilty "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  Stated differently, the petitioner "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).  This is an "objective" inquiry that takes into account factors such as "the strength of the evidence against a defendant, the lack of viable defenses, and the benefits of the plea bargain." *Plumaj v. Booker*, No. 14-2023, 2015 WL 6143355, at *4 (6th Cir. Oct. 20, 2015) (citing *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012); *Haddad v. United States*, 486 F. App'x 517, 522 (6th Cir. 2012)).

Courts may approach the *Strickland* analysis in any order, and an insufficient showing on either prong ends the inquiry. *Strickland*, 466 U.S. at 697.

The Supreme Court has repeatedly commented on the interaction between AEDPA deference under § 2254(d) and *Strickland*'s standards of review.  For example, in *Harrington v. Richter*, the Court emphasized that "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland*'s standard."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  Under § 2254, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."  *Id.*  Both standards are "'highly deferential' and when the two apply in tandem, review is 'doubly'" deferential.  *Id.* at 105 (citations omitted).  Under § 2254(d), "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*  Also, because the *Strickland* standard is a "general" standard, "the range of reasonable applications is substantial."  *Id*.

The Sixth Circuit has held that when a state court relies only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to the other *Strickland* prong.  *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012).

In this case, the Kentucky Court of Appeals accurately described the *Strickland* standard and accurately allocated the burden to Smith when it analyzed and denied his ineffective-assistance-of-counsel claims.  *See Smith v. Commonwealth*, No. 2013-CA-000532-MR, 2014 WL 3722010, at *1 (Ky. Ct. App. July 25, 2014), *reh'g denied* (Dec. 2, 2014), *review denied* (Aug. 12, 2015).    Here, the state courts adjudicated Smith's *Strickland* claims on the merits as described below.  This Court must grant full double-deference to that decision under § 2254(d).

### B.  Smith's Faulty Advice Claim

### 1.  The State Court's Decision

The Kentucky Court of Appeals affirmed the trial court's dismissal of Smith's post-conviction motion on his faulty advice claim.  *Smith*, 2014 WL 3722010, at *2-3.  The appellate court reasoned as follows:

> The trial court found [Smith's bad-parole-advice] claim to be meritless, noting that the Department of Corrections calculates parole eligibility according to 501 KAR 1:030 regardless of whether the sentences are ordered to run concurrently or consecutively, and Smith's counsel could not negotiate a plea contrary to the administrative regulation.  The court found that Smith's counsel competently negotiated a deal for concurrent sentencing, thus placing Smith in the best possible position for parole consideration.
>
> Further, during the guilty plea colloquy, the trial court advised Smith that the sentence imposed would run concurrently and may affect parole eligibility. The court asked Smith if he was familiar with the possible effects, to which Smith responded yes.  Smith requested no clarification.  We fail to appreciate Smith's present claim that his counsel was deficient for failing to clarify something Smith himself stated he understood.  Since Smith has not met the first prong of the *Strickland* test, we need not proceed any further in discussing this claim of error.

*Id*. at *2.  The question under AEDPA is whether this analysis under *Strickland* was unreasonable.

### 2.  Analysis

At the outset, the Warden argues that the state court's opinion cannot be an "unreasonable application of clearly established Federal law" under 28 U.S.C. § 2254(d)(1) because the Supreme Court has not established any "specific legal rule regarding a lawyer's duties to inform his client about parole eligibility" in a non-death-penalty case.  D.E. 8 at 53. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court."  *Harrington*, 562 U.S. at 101.  Smith has not identified any Supreme Court precedent

36

holding that inaccurate parole-eligibility advice can constitute deficient performance under *Strickland*. Smith attempts to rely on *Padilla v. Kentucky*, 559 U.S. 356 (2010), in which the Supreme Court found that failure to advise a client that pleading guilty could lead to deportation *was* deficient performance. D.E. 11 at 26. But neither the Supreme Court nor the Sixth Circuit has extended *Padilla* to encompass bad-parole-advice claims under § 2254.[13] Smith's claim therefore fails.

Even assuming a bad-parole advice claim is a species of *Strickland* claim cognizable under § 2254, Smith's claim fails on the merits under AEDPA's double-deference review. The Kentucky Court of Appeals held that Smith failed to establish deficient performance for two reasons. First, Smith's counsel "competently negotiated a deal for concurrent sentencing" and could not possibly have "negotiate[d] a plea contrary to the administrative regulation." *Smith*, 2014 WL 3722010, at *2. Second, and more importantly, Smith's claim was contradicted by the transcript of the plea colloquy.

---

[13] In the factually similar case of *Brown v. Simpson*, No. 3:05-cv-P787-H, 2007 WL 1309570, at *2 (W.D. Ky. May 2, 2007), the court denied relief, noting that "[t]he United States Supreme Court has never ruled that the failure to advise a client as to his parole eligibility constituted ineffective assistance of counsel, a necessary element to grant relief under 28 U.S.C. § 2254." This remains true, even after *Padilla*.

The Sixth Circuit has held that "giving erroneous advice about parole may constitute deficient performance." *McAdoo v. Elo*, 365 F.3d 487, 499 (6th Cir. 2004). And

> [a]ffirmative misstatements about parole possibilities are more objectively unreasonable than failure to inform the defendant about the parole possibilities. . . . When defense counsel grossly misinforms a defendant about details of parole and the defendant relies on that misinformation, the defendant may have been deprived of his constitutional right to counsel.

*Id*. However, circuit-court precedent such as this does not constitute "clearly established Federal law, as determined by the Supreme Court of the United States." *See Parker*, 132 S. Ct. at 2155; 28 U.S.C. § 2254(d)(1). Thus, although a federal defendant may assert a parole-misadvice *Strickland* claim on direct review, a state habeas petitioner may not.

Citing the plea colloquy, the state appellate court found that counsel could not have been "deficient for failing to clarify something Smith himself stated he understood."  *Smith*, 2014 WL 3722010, at *2.  At his plea colloquy, the court told Smith:

Court:  It's a concurrent sentence but it does add problems to you, like PFO eligibility, it may affect parole eligibility, it may affect a number of things. Are you familiar with all of the things it can affect you with?

Smith:  Yes I am.

Court:  If I can sign off on this and I agree to this, then are you going to be satisfied with this now and in the future, too?

Smith:  Yes, sir.

Court:  You know, not just today you got to be satisfied with this, man.  It's, it'll come back to haunt you probably sometime in the future somewhere along the line.  You understand that, too?

Smith:  Yes [nods head in agreement.].

Court:  Do you have any questions about that?

Smith:  No, sir.

Court:  Okay, have you talked this over with Mr. Beckett?

Smith:  Yes, sir.

*****

Court:  Do you think this is the best thing for you to do?

Smith:  Yes, sir.

Court:  Do you think it's better to do this than to go in front of a jury and let a jury hear your case?

Smith:  I'm sorry.

Court:  Do you think it's better to do this than to go in front of a jury and let a jury hear your case?

Smith: Yes, sir.

*See* D.E. 8 at 8-9; D.E. 10.

Smith argues to this Court that the sole reason he accepted the plea deal was because he understood that his parole eligibility date would remain unchanged.  D.E. 1 at 4; D.E. 11 at 24.  However, the trial court clearly warned Smith that his plea agreement—despite including concurrent sentencing—"may affect [his] parole eligibility."  Smith replied that he understood "all the things [his plea deal] could affect."  If the sole inducement for Smith to accept the plea deal was because it left his parole eligibility date unchanged, then why would he not say something when the court said, "It's a concurrent sentence but it does add problems to you, like . . . it may affect parole eligibility?"  It was reasonable for the Kentucky Court of Appeals to rely upon Smith's indication that he understood such potential effects.

This case is similar to *Ramos v. Rogers*.  In that case, a state habeas petitioner who pleaded guilty to rape alleged that his attorney promised him he would be released on probation after ten years.  *Ramos v. Rogers*, 170 F.3d 560, 561 (6th Cir. 1999).  In fact, he was not eligible for probation at all.  *Id*. at 562.  The Court of Appeals found that, assuming the attorney had misinformed him, "the trial court's proper plea colloquy cured any misunderstanding he may have had about the consequences of his guilty plea."  *Id*. at 561.  At his plea colloquy, the judge told the defendant that rape was "not a probationable offense," and he was "not going to receive probation under any circumstances."  *Id*. at 562.  Even though Mr. Ramos's attorney later told the court that he had told Mr. Ramos that he would be released on probation, the Court of Appeals held that Mr. Ramos could not establish prejudice under *Strickland*.  *Id*. at 565.

First, the Court of Appeals explained that when "the court has scrupulously followed the required procedure" during a plea colloquy, "the defendant is bound by his statements in response to that court's inquiry."  *Ramos*, 170 F.3d at 563 (quoting *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986)).  Accordingly, in cases where the court has followed the required guilty plea procedure, "absent extraordinary circumstances, or some explanation of why defendant did not reveal other terms, at least when specifically asked to do so by the court, *a defendant's plea agreement consists of the terms revealed in open court*."  *Id*.  The *Ramos* court applied the "extraordinary circumstances" test (without AEDPA deference) and held that Ramos had to be "bound to the answers" he provided during the plea colloquy.  *Id*. at 566.  The court broadly concluded that "a claim of ineffective assistance of counsel predicated on allegedly misleading information given by counsel about the terms of a plea agreement can *never constitute* an 'extraordinary circumstance' under *Baker* when the court conducts a proper, clear, and thorough plea colloquy."  *Id*. at 565.

Applying the logic of *Ramos* to Smith's case yields the same result.  Just as the trial court's statements in *Ramos* contradicted the defense attorney's misadvice, the trial court's statement in this case that Smith's "concurrent sentence . . . does add problems to you, like . . . it may affect parole eligibility" contradicted his attorney's advice that the concurrent sentence would *not* affect his parole eligibility.  Smith has not alleged that the plea colloquy was in any way deficient.  Because "a defendant must be bound to the answers he provides during a plea colloquy," *Ramos v. Rogers*, 170 F.3d at 566, Smith is bound by his statement that he understood that his concurrent sentence "may affect parole eligibility."   Smith has not established any

"extraordinary circumstance" that would circumvent this rule. *Id*. at 563 (quoting *Baker*, 781 F.2d at 90).

Another case on point is *McAdoo v. Elo*. The state habeas petitioner in *McAdoo* argued that the only reason he pleaded guilty to second-degree murder was because his plea deal gave him a parolable life sentence rather than a sentence of life without parole. *McAdoo v. Elo*, 365 F.3d 487, 490 (6th Cir. 2004). However, McAdoo discovered that defendants with life sentences in his state almost never obtained parole. *Id*. at 497-98. He argued that the "plea bargain was illusory because he obtained no benefit from entering a guilty plea." *Id*. at 497. The Court of Appeals reasoned that, nevertheless, McAdoo did obtain the "possibility" of parole—however remote. *Id*. at 498. And a defendant's "mere expectation about the parole process is 'simply no ground for habeas relief.'" *Id*. (quoting *James v. Cain*, 56 F.3d 662, 667 (5th Cir. 1995)). Applying *de novo* review to McAdoo's *Strickland* claim, the Court of Appeals found that he could not establish prejudice under these circumstances. The Court of Appeals also held, citing *Ramos*, that McAdoo was bound by his sworn statements at his plea colloquy that he understood the terms of the plea agreement and that no additional promises had been made. *Id*. at 495-97.

Both *Ramos* and *McAdoo* are analogous to Smith's case. In light of their reasoning, the state court's decision could not have been an unreasonable application of *Strickland*.

Another instructive case is the Sixth Circuit's recent decision in *Plumaj v. Booker*, No. 14-2023, 2015 WL 6143355 (6th Cir. Oct. 20, 2015). There, the state habeas petitioner argued that his counsel had provided "grossly misleading advice" about his parole eligibility, and that this misadvice induced his plea. *Id*. at *1. According to Plumaj, his attorney told him he would be parole eligible after 180 months. In truth, he would not be parole eligible until serving at least

306 months. *Id*. at *4. Plumaj also alleged he had valid defenses and that he had rejected a prior plea deal and waited until the day of trial to accept the deal. *Id*. The Michigan trial court found that Plumaj's plea was fairly, voluntarily, and knowingly made. *Id*. at *1. The Michigan Court of Appeals and Michigan Supreme Court denied review. *Id*.

On habeas review, the federal district court held there was "no clearly established Supreme Court case that recognized that bad advice about parole eligibility would render a plea involuntary or provide the basis for an ineffective-assistance-of-counsel claim." *Plumaj*, 2015 WL 6143355, at *2. The district court further found that *Padilla* did not extend beyond bad deportation advice to encompass bad parole advice. *Id*.

The Court of Appeals made no statement in *Plumaj* regarding whether *Padilla* extended to bad parole advice claims. Implicitly assuming that it did, and assuming the Plumaj's allegations were true, the Court of Appeals applied AEDPA deference and held that the state trial court's ruling was not unreasonable. *Plumaj*, 2015 WL 6143355, at *5 ("Though the trial court's finding of no prejudice may well have been incorrect, it was not unreasonable."). Because Plumaj's claim failed under *Strickland*'s prejudice prong, the Court found no need to address the performance prong. *Id*. at *5 n.6.

Smith's case is factually similar to *Plumaj*. If anything, Smith's allegations of attorney misadvice are less meritorious. Although the cases were decided on different *Strickland* prongs, the result is the same.

The question under AEDPA is not whether the Kentucky Court of Appeals was incorrect in relying on Smith's statements to the sentencing judge. The question is whether the appellate court was objectively unreasonable for doing so. Because the state court's decision was in line

42

with cases like *Ramos* and *McAdoo*, it was not an unreasonable application of the performance prong of *Strickland*.  It was not objectively unreasonable for the state court to find Smith's statements at his plea colloquy more credible than his claim on collateral review.  In fact, the Sixth Circuit commonly defers to the state courts' judgment in cases when the petitioner claims the plea colloquy transcript does not reflect the fact he was misinformed about his sentence.  *See, e.g.*, *Rinckey v. McQuiggan*, 510 F. App'x 458, 463-64 (6th Cir. 2013); *Marks v. Davis*, 504 F. App'x 383, 386 (6th Cir. 2012).

In conclusion, Smith's claim fails on the merits for two independent reasons.  First, the Supreme Court has not held that a bad-parole-advice claim may be properly heard under § 2254(d)(1).  Second, a "reasonable argument" exists that "counsel satisfied *Strickland*'s deferential standard."  *Harrington*, 562 U.S. at 105.  The state court's decision under the deficient-performance prong of *Strickland* was not unreasonable.  There is no need under these circumstances to consider the prejudice prong.  Even assuming Smith's faulty advice claim was timely, it fails on the merits.

### C.  Smith's Failure-to-Investigate Claim

Finally, in the event that Smith's failure-to-investigate claim was timely filed, it also fails on the merits.  The state court's ruling was not unreasonable.

### 1.  The State Court's Decision

The Kentucky Court of Appeals provided the following analysis of Smith's claim:

> The trial court found Smith's claim of error amounted to a bare allegation with no factual support and summarily dismissed it.  *See Roach v. Commonwealth*, 384 S.W.3d 131, 140 (Ky. 2012) ("[c]onclusory allegations that counsel was ineffective without a statement of the facts upon which those allegations are based do not meet [R.Cr. 11.42(2)'s] specificity standard and so 'warrant a summary dismissal of the motion.'" (quoting [R.Cr. 11.42(2)])).  Smith

provided the aforecited ten-word quote (with two ellips[e]s) purportedly made by the victim as his sole evidence that his counsel failed to conduct a reasonable investigation.   However, this alleged evidence does not disprove that Smith participated in the riot, nor does it conclusively disprove that Smith threw a rock at the victim.   Nor does it demonstrate how the 3,000 pages of discovery the prosecutors intended to present against Smith were disproved.   The court found Smith's counsel rendered competent assistance, and refused to second-guess counsel's actions in hindsight without any factual basis for doing so.   The court further found that based on the record, counsel's decision to advise Smith to plead guilty was reasonable and Smith's guilty plea was knowingly, intelligently, and voluntarily made.   As a result, the court denied Smith's request for [R.Cr. 11.42] relief.   Based on the record, we are unable to say the court's decision was erroneous.

*Smith v. Commonwealth*, No. 2013-CA-532-MR, 2014 WL 3722010, at *2 (Ky. Ct. App. July 25, 2014), *reh'g denied* (Dec. 2, 2014), *review denied* (Aug. 12, 2015).

The state court's written opinion does not specify which prong of *Strickland* it relied upon, but the context and holding made make clear that the court addressed deficient performance.   Smith agrees with this interpretation.   D.E. 1 at 34.   Earlier in its opinion the court correctly described the showing of prejudice that Smith had to make to succeed.   The court noted that he would have to show a reasonable probability that he would not have pleaded guilty, but would have insisted on going to trial.   *Smith*, 2014 WL 3722010, at *1-2.   Nowhere in its discussion of Smith's failure-to-investigate claim did the court apply that standard.   Instead, it analyzed the Circuit Court's decision that Smith's counsel had "rendered competent assistance" and that counsel's decision to advise Smith to plead guilty "was reasonable."   These were clearly assessments on the merits of whether counsel performed deficiently.   Therefore AEDPA double-deference applies.

### 2.  Analysis

That double-deference dooms Smith's claim.  In his R.Cr. 11.42 motion, Smith claimed that his counsel failed to "conduct a reasonable investigation that would have uncovered a meritorious defense" and failed to "accord Defendant's claim of actual innocence sufficient weight."  D.E. 8-3 at 12.  He contended that the interview of Officer Cabrera exonerated him and, had he known of that interview, he would not have pleaded guilty.  But, Smith provided no evidence to support this theory, such as delineating what investigative steps counsel took or unreasonably failed to take.  Thus, the Circuit Court described Smith's allegations as "bare" and unsupported because Smith presented no facts that actually addressed counsel's conduct.  D.E. 8-3 at 29.  It also found that advising Smith to plead guilty was reasonable, and that the plea was knowingly, voluntarily, and intelligently made.  D.E. 8-3 at 30.  In turn, on appeal, Smith argued that counsel "did not conduct any investigation."  D.E. 8-3 at 53.  This was simply a bare assumption made by Smith throughout his case without any evidentiary support.

The Court of Appeals began its analysis by observing that the content of the Cabrera interview was the "sole evidence" presented by Smith.  *Smith*, 2014 WL 3722010, at *2.  It then logically looked to that evidence and determined that it did not completely exonerate him.  With no other evidence before it, the appellate court found that the Circuit Court reasonably concluded that "Smith's counsel rendered competent assistance, and refused to second-guess counsel's actions in hindsight without any factual basis for doing so."  *Id*.  That is not an unreasonable determination.  Indeed it was the only allowable finding given that Smith provided no actual evidence of any steps his counsel took or failed to take to investigate a defense.  The same is true

with respect to the appellate court's finding that "based on the record, counsel's decision to advice Smith to plead guilty was reasonable." *Id*.

Before this Court, Smith acknowledges that "the court's duty . . . would be to evaluate the advice given to Smith, the investigation done by trial counsel, and the significance of undiscovered information in the context of the entire case[.]"  D.E. 1 at 36.  But then Smith acknowledges, "[i]n this case, the Court has no information about the counsel's investigation." *Id*.  That lack of information was the basis of the ruling by the Court of Appeals, not a flaw in it. In other words, it certainly was reasonable to conclude that—without any evidence offered by Smith except for the substance of the Cabrera interview—the record supported the Circuit Court's finding that counsel provided competent assistance and gave reasonable advice.  Smith's supposition that counsel must have completely failed to investigate does not render that determination unreasonable.

## IV.  Motion to Expand and for Evidentiary Hearing

This case does not warrant an evidentiary hearing.  First, regarding the merits, review under § 2254 is "limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Evidence introduced in federal court has "no bearing" on § 2254 review.  *Id*. at 185.  Thus, the Court may not consider any additional evidence in addressing the merits.

Second, Smith seeks an evidentiary hearing concerning the timelines of his failure-to-investigate claim, but not his bad-parole-advice claim.  D.E. 12.  The Court has analyzed the timeliness of the former claim consistent with Smith's theory that the Cabrera interview was included among his discovery materials (otherwise Smith would be asserting a procedurally

46

defaulted *Brady* claim).   Given that factual determination, the reasoning above compels the conclusion that his claim is untimely.   No factual disputes require a hearing.

Section 2254(e)(2) bars the Court from conducting an evidentiary hearing unless certain standards are met.   Under the provisions relevant to this case, no hearing may be held unless the claim relies on (1) "a factual predicate that could not have been previously discovered through the exercise of due diligence;" and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."   28 U.S.C. § 2254(e)(2).

As previously discussed, the recorded interview—the evidentiary heart of Smith's actual-innocence claim and his claim regarding the timeliness of his failure-to-investigate claim—is not new evidence.   According to Smith's theory, it was contained in his discovery materials.   He could have found it before he pleaded guilty by exercising due diligence.   Nor is the interview so exculpatory that it constitutes "clear and convincing evidence" that "no reasonable factfinder" would have found him guilty.   Smith must meet both of these standards to obtain a hearing under 28 U.S.C. § 2254(e)(2)(B).

Smith also moves "to expand the record to include the '3,000 pages of discovery'" that the Warden mentions in his response brief.   D.E. 12 at 1.   Smith contends that expansion is necessary because the Warden describes the discovery as "voluminous," but its contents are not in the record.   *Id.* at 7-8.   Again, the Court is holding Smith to his theory that the Cabrera interview was included in the discovery.   Whether the discovery was "voluminous" is not the Court's focus.   Expansion is therefore not warranted.

The Court also notes that Smith was represented during his plea and sentencing by counsel with the Department of Public Advocacy. D.E. 1 at 2 n.2. The same entity represents Smith before this Court. The discovery was placed into issue by Smith in his R.Cr. 11.42 motion. D.E. 8-3 at 12. Given the Department of Public Advocacy's involvement both at the trial level and before this Court, the Court is not persuaded that expansion is appropriate for Smith to determine what was in his counsel's file.

## V. Certificate of Appealability

The Court further recommends that no Certificate of Appealability ("COA") should issue. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires a petitioner to demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). In other words, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id*. When "a plain procedural bar is present," no COA may issue. *Id*. To obtain a certificate with respect to such a bar, Smith must show that "no jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

In this case, Smith's claims warrant dismissal under the statute of limitations and fail on the merits. A "plain procedural bar"—the statute of limitations—prevents the court from addressing them. No reasonable jurist would find these conclusions to be debatable or wrong. Smith therefore does not warrant any encouragement to proceed further.

48

### VI. Conclusion and Recommendation

Smith failed to file his federal petition within AEDPA's limitation period.  He has not established a basis for equitable tolling.  Accordingly, the undersigned **RECOMMENDS** that Smith's habeas petition (D.E. 1) be **DISMISSED** as time-barred under 28 U.S.C. § 2244(d), and that his Motion to Expand the Record and for Evidentiary Hearing (D.E. 12) be **DENIED.**  Even if Smith's claims were not time-barred, they fail on the merits.  The Court further **RECOMMENDS** that no Certificate of Appealability ("COA") should issue.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute.  *See also* Rules Governing Section 2254 Proceedings, Rule 8(b).  Within fourteen days after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court.  Failure to make a timely objection consistent with the statute and rule may—and normally will—result in waiver of further appeal to or review by the District Court and Court of Appeals.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 26th day of February, 2016.

**Signed By:**

*Hanly A. Ingram*

**United States Magistrate Judge**